I. E. HUSTON, Appellant, *vs.* WILLIAM H. SMITH *et al.* Appellees.

*Opinion filed February 25, 1911.*

1. DURESS—*what is necessary to constitute duress.* To justify setting aside a deed knowingly and regularly executed and acknowledged, upon the ground that it was obtained by duress, the acts relied upon must amount to more than mere importunate persuasion or even threats, unless accompanied by such acts as induced the grantor to act under fear of his life or great bodily harm.

2. DEEDS—*when deed from husband and wife should not be set aside.* A deed by a husband conveying to his wife his half interest in property, which they owned jointly, upon the agreement that she would use her own money to pay the indebtedness contracted in building the house, will not be set aside in equity where the preponderance of the evidence shows that at the time the deed was made, and for some time thereafter, the parties lived amicably together, and that the acts relied upon to show that the husband was of unsound mind and acted under duress or undue influence occurred subsequent to the execution of the deed.

3. SAME—*conveyance from husband to wife is presumed to be a gift.* Where a husband conveys land to his wife the presumption is that it was intended as a gift, and the burden is on the husband to overcome such presumption when seeking to set the deed aside.

4. SAME—*duly acknowledged deed cannot be impeached by testimony of grantor alone.* The certificate of the officer authorized by law to take an acknowledgment, that a deed was executed and acknowledged by the grantor, cannot be overcome or impeached by the testimony of the grantor alone.

5. The court reviews the evidence in this case, and holds it insufficient to establish that the deed here sought to be set aside was executed under duress or during insanity produced by duress, as alleged in the bill.

APPEAL from the Circuit Court of Vermilion county; the Hon. W. B. SCHOLFIELD, Judge, presiding.

F. L. DRAPER, for appellant.

RALPH B. HOLMES, (GEORGE H. MILEMORE, of counsel,) for appellees.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed by appellant, I. E. Huston, in the circuit court of Vermilion county, on August 31, 1909, against the appellees, Emma Huston, William H. Smith, Jennie Smith and Mary Robinson, to set aside a deed executed on July 26, 1906, to the undivided one-half of lot 10 in Seminary addition to Danville, in said county, made by I. E. Huston to Emma Huston, on the ground that I. E. Huston was caused to execute said deed by the duress of the said appellees, and that at the time of the execution thereof said I. E. Huston was mentally incapable of understandingly executing said deed. An answer and replication were filed and the case was referred to a master to take the proofs and report his conclusions. The master took the proofs, and, after overruling objections thereto, filed a report recommending that the bill be dismissed for want of equity. The objections were renewed as exceptions in the circuit court and overruled, and a decree was entered in accordance with the recommendations of the master, and the complainant has prosecuted an appeal to this court.

The bill alleged that the complainant was the owner of the undivided one-half of the premises in controversy; that appellees conspired and confederated together to financially injure and damage him and deprive him of his property; that they maliciously and wickedly instituted, originated and carried on against him a systematic and continuous course of cruel and inhuman treatment, and by threats, demands and commands insisted that he convey to his wife, Emma

Huston, his interest in said premises; that as a result of such treatment his health declined, and on account of the loss of sleep and the continued wrong and nagging which he was subjected to by the appellees he was attacked with locomotor ataxia, his eyesight was affected, his ability to walk became impaired and his mental and physical condition was such that he was not capable of understandingly doing ordinary business; that on July 26, 1906, in consequence of such condition, he yielded to the importunities of his wife and her relatives and conveyed his interest in said premises to his wife, Emma Huston.

In order to make a case under the averments of this bill it was necessary that the complainant establish, first, that said deed was executed in consequence of duress; and secondly, that as a result of such duress a state of insanity was produced in the complainant, which existed at the time the deed was executed. *Brower* v. *Callender,* 105 Ill. 88; *Rendleman* v. *Rendleman,* 156 id. 568; *Hagan* v. *Waldo,* 168 id. 646; *Hintz* v. *Hintz,* 222 id. 248.

In the *Brower case, supra,* the daughters of Mary Oakley (who was eighty years of age and in poor health) threatened to have her arrested and taken before the county court and have a conservator appointed for her and to cause the use and control of her property to be taken from her, and asserted they had such power and would immediately exercise it unless she deeded her property to a trustee, and she, apprehensive of such proceedings, conveyed her property to a trustee. Afterwards, on a bill filed by Mary Oakley to set aside said trust deed, this court, speaking through Mr. Justice Scholfield, said, on page 100: "Without undertaking to define with precision what will and what will not constitute such duress as justifies the setting aside of a deed knowingly executed and acknowledged in due form, we are clear the evidence here does not establish such duress. Mere vexation and annoyance are not sufficient for that purpose, unless, indeed, it be shown that the mind was

in that condition that by reason of such vexation and annoyance a state of insanity was produced, which existed at the time of the executing and acknowledging of the deed. Without disregarding the evidence of Loucks, which we cannot do, the trust deed was a result finally reached by Mrs. Oakley that met with the approval of her judgment on grounds of personal convenience as well as on other grounds. It was not the product of her fears,—the result of a paralyzed will,—but of a deliberate and voluntary judgment."

In the *Rendleman case, supra,* which was a bill to·set aside a deed, it appeared that J. A. Wilson and a son of the appellee, in company with a justice of the peace, went to the home of the appellant at night. Wilson went into the house alone and informed the appellant he was a United States officer and had been sent by the court at Springfield to get a deed from the appellant and his wife. Appellant refused to make the deed. Wilson stated if he could not get the deed one way he would another, and showed the appellant a pistol, and slapped him. The justice of the peace was then called in and the appellant asked him what he should do, and the justice said he would not advise him as he might advise him wrongly. Appellant then retired and talked with his wife, and after some time he stated he would make the deed, and ·the justice of the peace then prepared a deed and the appellant signed and acknowledged it. This court, speaking through Mr. Justice Baker, on page 571 of the opinion, said: "The question presented for our determination is whether or not the foregoing state of facts constitutes such fraud or duress as should avoid the deed. In *Willemin* v. *Dunn,* 93 Ill. 511, it was held that mere mental weakness will not authorize a court of equity to set aside an executed contract if such weakness does not amount to inability to comprehend the contract and is unaccompanied by evidence of imposition or undue influence. And in *Stover* v. *Mitchell,* 45 Ill. 213, and *Kerting* v. *Hil-*

*ton,* 152 id. 658, it was held that in order to constitute duress, or such undue influence as will avoid an executed contract, such a pressure must be brought to bear upon the person seeking such avoidance as to interfere in some way with the free enjoyment of his rights of person or of property. The record before us does not show that any such pressure was brought to bear upon the appellant as could have interfered in any way with the free enjoyment of his rights, either of person or of property. At most he was but threatened, vexed and annoyed. The threats, moreover, were made some time prior to the entrance of Hagler and the execution óf the deed. How they could have so affected his mind with terror as to have induced him to afterwards sign the deed is not easily understood, for at its execution both his wife and Hagler, a disinterested person, were present, and one Smith, an employee of appellant, and likewise a disinterested person, was about the house, and so there could not possibly have been any ground for believing there was present danger. And mere threats of imprisonment, for which there is no ground, do not constitute duress, as the person threatened could not be put in fear thereby. Nor do threats of criminal prosecution constitute duress when neither warrant has been issued nor proceedings commenced. (6 Am. & Eng. Ency. of Law, p. 64, note 1, and cases cited.) In *Hamilton* v. *Smith,* 57 Iowa, 15, it was held that where the evidence showed the conveyance was an intelligent, voluntary act, the fact that the deed was executed reluctantly and after some threats had been made was insufficient to establish undue influence or duress.—See *Baldwin* v. *Murphy,* 82 Ill. 485."

In the *Hagan case, supra,* a bill was filed to set aside a deed to a daughter. This court, speaking through Mr. Justice Craig, on page 648, said: "Bongard and his wife were French. They were both of a quarrelsome disposition, and, as appears from the evidence, they were for many years engaged in disputes and quarrels over various mat-

ters.  At one time they would be in a bitter quarrel with one daughter, and in a short time peace would be declared and then a row would be started with the other daughter. Which one was to blame for the troubles which kept the domestic relations of the Bongard family in a constant turmoil it is. somewhat difficult to determine from the evidence.  Some of the neighbors think the old man was the cause of the disturbance, while, on the other hand, others equally reliable and credible think the blame should be placed at the old lady's door.  But however this may be, these quarrels and family disturbances cannot be regarded sufficient ground for setting aside the deed.  Conceding that Bongard and his wife lived in a quarrel for forty years, that fact would not vitiate the deed.  Unless the wife, at the time of executing the deed, was under actual duress and the deed was not her act, it must be sustained. If, at the time the deed was executed, the complainant was under such coercion and restraint that her mind was paralyzed from fear of her life or great bodily harm if she refused to execute the deed, and under such coercion the deed was executed, then it could not be regarded as her act."

In the *Hintz case, supra,* the title to certain real estate was in the wife, upon which she and her husband were erecting a building. and the husband was superintending its construction.  The wife and husband disagreed, and he stated he would have nothing more to do with the building until his rights were recognized.  This statement brought on a quarrel, and the husband knocked his wife down and used violent language toward her, seized her by the wrists and twisted them until they bled, and otherwise cruelly treated her.  Immediately thereafter she went to the office of a notary public near by and after some conversation with him executed a deed conveying one-half of the premises to her husband and the other half to her daughter and returned and delivered it to her husband, who placed it in a drawer with his other papers.  The wife within a few

weeks took the deed from the drawer and tore it up. She afterwards filed a bill for divorce, in which she alleged the deed had been procured by duress, fraud and undue influence, and prayed that it be set aside as a cloud upon her title. This court, speaking through Mr. Justice Wilkin, on page 252, said: "The only question for determination is whether these facts are sufficient to entitle appellant to the relief prayed. The allegation of her bill is that the execution of the deed was procured by duress, fraud and undue influence. The undue influence which will justify the setting aside of a deed must be of such a character as to deprive the grantor of free agency. (*Shea* v. *Murphy,* 164 Ill. 614.) To justify the setting aside of a deed on the ground of duress the grantor must at the time of its execution have been in such fear of his or her life or of bodily harm in case of refusal, as to so affect the mind that the execution of the deed was not his voluntary act. (*Hagan* v. *Waldo,* 168 Ill. 646.) Mere vexation, annoyance and threats' of personal injury, or of imprisonment for which there is no ground, or threats of criminal prosecution, do not constitute duress, where no proceeding has been commenced and no warrant issued. We have held that showing the grantor a pistol and slapping him, to induce him to sign a deed, which acts took place some time before the actual signing, did not constitute duress, where it appeared the grantor did not conclude to sign the instrument until after deliberation and taking advice. (*Rendleman* v. *Rendleman,* 156 Ill. 568.) Under these rules of law it is clear the evidence in this record does not sustain the allegations of complainant's bill."

The evidence is conflicting, but it tends to prove that I. E. Huston, who was an eye and ear doctor, and Emma Huston, his wife, had by their joint earnings accumulated enough property to buy and pay for a house which cost $1750. This house was subsequently sold and the money divided equally between them. They then went to Chicago,

where the appellant spent a good share of his portion of the proceeds of the sale in attending a post-graduate course in medicine. They then went to Danville, where appellant engaged in the practice of his profession, and soon thereafter they purchased the premises in question for $1700, which was conveyed to them jointly. Of the purchase money $850 was paid by Emma Huston and $50 by I. E. Huston, and the balance was borrowed of Mary Robinson, a sister of Emma Huston. They afterwards erected a dwelling house upon said premises. Nine hundred dollars were borrowed of Mary Robinson, $1650 of William H. Smith, a brother-in-law of Emma Huston, and $1400 of E. X. Leseure, which was used in paying for the construction of said dwelling house, and when completed the doctor and Mrs. Huston occupied said dwelling house as a home. Subsequently Emma Huston received an inheritance of $2600, and she agreed with the doctor if he would convey his interest in the home to her she would use the $2600 which she had inherited from her mother in paying the indebtedness which they had contracted for the purpose of building said house. The doctor went to a lawyer's office in Danville and had the deed prepared conveying his interest in said premises to his wife and signed and acknowledged it and carried it home with him, and Emma Huston then signed the deed and acknowledged it over the telephone before the notary public who had taken the acknowledgment of I. E. Huston, and the doctor then delivered the deed to his wife and she had it recorded. After the conveyance the doctor and Mrs. Huston lived in the house for some months in perfect harmony, when they had trouble over the refusal of Emma Huston to sign a note with her husband to raise money with which to buy stock in an insurance company in which he had become interested. Thereafter the appellant became afflicted with locomotor ataxia, which impaired his ability to walk and to see, and thereafter he requested his wife to re-convey to him the half

interest in said premises, which she declined to do. He thereupon filed this bill against her. Subsequent to the filing of this bill Emma Huston filed a bill for divorce against the doctor charging him with extreme and repeated cruelty and adultery, and the doctor filed a cross-bill charging Emma Huston with adultery. The adultery charges on both sides were abandoned and the case was tried on the charge of extreme and repeated cruelty contained in the original bill, and the jury found in favor of the defendant in the original bill, which verdict was set aside by the court and the divorce case was not disposed of at the time a decree was entered in this case. The charges and counter-charges made by the respective parties against each other alienated the parties, and the wife would not permit the appellant to enter the home and the appellant broke down the doors, which led to his arrest. Those matters are, however, immaterial, we think, as they all occurred subsequent to the execution of the deed now sought to be annulled and set aside. The appellant testified he was forced to execute the deed by reason of the threats and importunities of his wife, Miss Robinson and Mr. and Mrs. Smith. He is uncorroborated, however, and Emma Huston, Mr. and Mrs. Smith and Miss Robinson deny they forced or induced Dr. Huston to convey said premises to the appellee Emma Huston.

On the question of the mental incapacity of the appellant to make the deed in July, 1906, the testimony of the appellant, I. E. Huston, stands substantially alone, while numerous witnesses who knew him well, several of whom he was treating in July, 1906, testified that in 1906 he was mentally sound. The appellant admits that at the time he executed the deed he was practicing his profession, and it appears from his testimony that the year 1906 was the most successful year, financially, he ever had while in practice in Danville. We think that while I. E. Huston was afflicted with locomotor ataxia or some other disease shortly after he executed said deed, it is clear he was not insane on

July 26, 1906, and that the deed was not executed as a result of duress. Subsequent to 1906 Dr. Huston and his wife and Mr. Smith and his wife were in Florida together for a number of weeks, and upon their return home Mr. Smith and wife made their home with Dr. Huston and wife, and apparently they were on the most intimate and friendly terms for some time subsequent to the execution of the deed.

We have read the evidence and it falls far short of making a case within the rule announced in the cases from which excerpts from the opinions have been set out in this opinion, and we are impressed with the fact that at the time the deed sought to be set aside was executed the relations between Dr. Huston and his wife were amicable but that thereafter they became hostile to each other. The law is well settled that when a husband conveys property to his wife the presumption is that it was intended as a gift, (*Fizette* v. *Fizette,* 146 Ill. 328; *Lewis* v. *McGrath,* 191 id. 401;) and the burden is upon the husband to overcome that presumption. There is no evidence in this record to show that Emma Huston, in obtaining said deed, in any way overreached her husband, or that she induced him to convey said premises to her with a view to then abandon him, as was the case in *Hursen* v. *Hursen,* 212 Ill. 377. Where a deed has been acknowledged and contains the certificate of an officer authorized by law to take an acknowledgment, the certificate of the officer showing that the deed was executed and acknowledged by the grantor cannot be overcome or impeached by the testimony of the grantor alone. (*Dickerson* v. *Evans,* 84 Ill. 451; *Blackman* v. *Hawks,* 89 id. 512.) As was said in *Hintz* v. *Hintz, supra,* it may be the appellant acted unwisely in conveying his interest in said premises to his wife. He cannot, however, in this proceeding have any relief, as courts of equity cannot arbitrarily grant relief against the acts of indiscretion and folly.

Finding no reversible error in this record the decree of the circuit court will be affirmed.          *Decree affirmed.*